## STATE, *ex rel.*, *v.* MORRISTOWN.

### (*Knoxville.* October 6, 1893.)

1. MUNICIPAL CORPORATIONS. *Subscriptions to railroads.*

   A subscription by a municipal corporation to the capital stock of a proposed railroad cannot be sustained under Acts 1887, Ch. 3, unless the application therefor purports in terms upon its face to have been made under that statute. This requirement of that statute is mandatory. (*Post, pp. 241–248.*)

   Acts construed: Acts 1887, Ch. 3.

2. SAME. *Same.*

   A subscription by a municipal corporation to the capital stock of a proposed railroad cannot be sustained, under our statutes, when the application therefor describes two lines beginning at the same point, one with fixed terminus at the other end, and its line located by survey and cost of its construction estimated, as required by the statutes, and the other left wholly indefinite, but suggesting a different line and terminus, without estimate of cost of construction, and the road is actually built upon a line and to a terminus other than that defined in the proposition. (*Post, pp. 248–250.*)

   Code construed: §§ 491*a*, 1142–1165 (T. & S.); §§ 1278–1297 (M. & V.).

   Cases cited and approved: Pulaski *v.* Gilman, MS., Nashville, 1880; Winston *v.* Railroad, 1 Bax., 60.

3. SAME. *Same. Estoppel.*

   A municipal corporation cannot be estopped to deny its liability upon a subscription to the capital stock of a proposed railroad, made without a lawful vote authorizing it, by the failure of its Board of Mayor and Aldermen to object to the construction of the road over a route and to a terminus other than that defined in the proposition upon which the subscription was made. (*Post, pp. 250–252.*)

   Case cited and approved: Milan *v.* Railroad, 11 Lea, 329.

---

FROM HAMBLEN.

---

Appeal in error from Circuit Court of Hamblen County. W. R. HICKS, J.

James G. Rose, Helm & Bruce, and Templeton & Cates for Relators.

Holloway & Essary, W. S. Dickson, and Jas. T. & J. K. Shields for Morristown.

Snodgrass, J. The relator is a corporation of this State chartered to build and operate a railroad from Morristown, in Hamblen County, to a connection with the Knoxville, Cumberland Gap and Louisville Railroad, in Grainger County, Tennessee.

As such, on March 18, 1890, it submitted to the Mayor and Aldermen of Morristown an application for subscription to the stock of said company, upon the proposition to build a railroad from said town to a terminus or termini therein set forth. The application and proposition were as follows:

"Morristown, Tenn., March 18, 1890.

"*To the Mayor and Aldermen of the town of Morristown, Tenn.:*

"We, the undersigned, desire to submit to your honorable body the following proposition: We will construct a standard gauge railroad from a point within the corporate limits of Morristown, in a north of west direction, to a point at or near Bean Station, and thence to a junction with the Knoxville, Cumberland Gap and Louisville Railroad at or near Cedar Ford, or to such a point on the said railroad north of Clinch Mountain as our engineers may select, covering the best route and most advantageous connection with Cumberland Gap. Work of grading to commence at Morris-

town within sixty days from affirmative election in Morristown, upon condition that the town of Morristown subscribe $50,000 to the stock of this company, to be paid for in cash or six per cent. twenty or thirty year town bonds as hereinafter named, and provided further that the county of Hamblen subscribe the further sum of $25,000 to the stock of our company, and the county of Grainger subscribe the sum of $75,000 to the said stock, both of said sums to be paid in cash or in six per cent. twenty or thirty year county bonds. The payment of the cash, or the delivery of said bonds, to be made to us upon the completion of the construction of the said road, viz.: When the last rail is laid connecting Morristown with the Knoxville, Cumberland Gap and Louisville Railroad. We shall ask a limit of time for the completion of this road not to exceed two years, the time to begin to run from sixty days from the day of the election to be held on the question of subscribing to said stock in the town of Morristown.

"As a first step toward getting these subscriptions, we respectfully ask that your honorable body submit the question of subscription to the qualified voters of Morristown. Very respectfully,

"THE MORRISTOWN AND CUMBERLAND GAP R. R. Co.
"Per J. G. MARTIN,
"JOHN P. ARTHUR,
"F. H. ALLISON,
"W. E. SCARRITT,
"W. TALBOT PENNIMAN,
"*Incorporators and Board of Directors.*"

It was accompanied by profiles and a sworn estimate of the grading, embankment, and masonry therewith according, by the engineer of the company.

The proposition was accepted by the Board, an election ordered and held, and the requisite majority duly voted "for subscription." The result was certified, and, in pursuance thereof, the Mayor was, by ordinance of the Board, duly authorized and instructed to subscribe for fifty thousand dollars of the stock of the railroad company, which he accordingly did.

The company began, and completed the road to a point near Cedar Ford, one of the terminal points indicated in the proposition, but not a point in Grainger County, and not the terminus according to profile and estimate submitted. Nor was the road built, beyond Bean Station, along or near the line indicated in the profile, and for which the survey and estimate had been made and filed. In other words, the proposition, unless profiles and estimate are to control, provided for two distinct, different, and remote lines, with terminal points at different and remote places on the road with which connection was to be made, and in different counties, one (that indicated in the profile and estimate) being in a north or north-western direction from Morristown, twenty-five miles in length, the most immediate and advantageous route to connect with Cumberland Gap at a point in Grainger County, and the other a line in a south-western

direction, forty miles in length, extending several miles beyond the western boundary of Grainger, and terminating in Knox County, at a more remote point, of course, and making a far less advantageous connection with Cumberland Gap, the point of junction, in fact, being farther from Cumberland Gap, by several miles, than is Morristown, the other terminus of the constructed route.

If the profiles and estimates filed do not control, there was, therefore, two propositions embraced in the application—one for a road from Morristown to Cedar Ford, without profile, map, or estimate submitted, and one from Morristown to a point north of Clinch Mountain to a junction with the Knoxville, Cumberland Gap and Louisville Railroad, over a defined line twenty-five miles long, whose grading, embankment, and masonry were estimated. If profiles and estimate control, there was but one proposition, and the Cedar· Ford terminus not important, being a superfluous addition thereto.

So much has been stated here, in advance of statement of the controversy and issues in this case, for convenience in application when these shall have been stated. The action is mandamus to compel defendant to pay cash for stock subscribed or issue twenty year six per cent. bonds therefor. The corporation defends upon the ground that the subscription was illegal, the application and submission to vote not being such as was legally authorized, and subscription by the Mayor therefore void.

Much contention has arisen whether· this application was made, election held, and subscription voted under the Act. of 1887 or under the Code provisions, §§ 1142–1165, inclusive. M. & V., §§ 1278–1297. (It is proper to observe here that the sections cited from the M. & V. compilation are not literal reproductions of the original Code sections cited, but purport to give them as amended up to and inclusive of the Act of 1881.)

The question in the abstract is very important, for though some provisions of both (Code and Act of 1887) are substantially similar, there is a difference in the powers conferred, the obligations imposed, and the rights secured under the two statutes. There is no power vested in municipal corporations under the Code provisions to issue bonds, and it has been expressly held that no such power is given or to be implied from Act of 1871 (now incorporated in M. & V. compilation as part of § 1282), Code (T. & S.), § 491a, to which the Act of 1881 (a further amendment, incorporated in same section of M.· & V. compilation) has, we hold, added nothing (*Mayor and Aldermen of Pulaski v. Gilman et al.,* MSS., Nashville, 1880), while under the Act of 1887 express power is given to issue bonds running not more than twenty years, or pay subscription in cash. Under the Code provisions, not more than thirty-three and one third per cent. of subscription can be collected in any one year, while under the Act of 1887 no tax ex-

ceeding twenty-five per cent. of the subscription can be levied in any one year.

Among most important differences as to rights of parties, the Code provides that the collector shall give to each tax-payer a certificate of tax paid by him. This is made negotiable by delivery or assignment, and is receivable for freight and passage on the road one year after its completion, and convertible into stock of the railroad company on demand, at option of holder of such certificates, to the amount of one or more shares. As a consequence of these rights thus secured to tax-payers, the obligation to so receive these certificates for freight, passage, and stock is imposed upon the railroad company.

No such provisions are made in the Act of 1887. To say nothing, therefore, of any minor differences in the two acts as to method and forms of application, etc., the most material difference exists in the powers conferred, obligations imposed, and rights secured under the two statutes. To guard against any confusion, to prevent any misconstruction or controversy as to these powers, rights, and obligations vested, acquired, and imposed under propositions for county or municipal subscriptions, the Legislature expressly provided in the latter statute, that it was not intended to prevent subscription under the former, but was an additional method or plan under which they could be made (§ 16); and further expressly provided that, "before any county shall make any subscription under the

provisions of this Act, the president or other authorized agent of the railroad company shall submit an application," etc., "setting forth that the application is made under this Act," and that "before any incorporated city or town shall make any subscription under the provisions of this Act, *such application* must be submitted," etc. Manifestly including by reference to *such application*, the "setting forth," that it is made "under this Act." § 3.

The language is itself mandatory, but, taken in connection with its obvious purpose, admits of no other construction than that it was intended to be mandatory, and we so hold.

Nothing could better illustrate the correctness of that view than the present case. Some substantial conformity to both Acts (as was expected by the Legislature might result), gives room for the ablest and most ingenious arguments to show that it might be held to have been made under either or both. This question was not intended to be left to intendment, to confusion, inference, or strained construction. Both statutes are plain in their provisions, and are intended for observance in mandatory particulars; and, if application is made under the latter for the special advantages it gives over the former, it must be so set forth in the application. But both upon its face and according to the actual facts proved as to intent, if such could be looked to, it was made not under the Act of 1887, but under the Code provisions. The application was not by the president

or an authorized agent or officer to a Mayor or chief executive officer, but was by directors to the Board of Mayor and Aldermen. It was accompanied not by a "map," as required by Act of 1887, but by the sworn estimates of an engineer of a surveyed route, as required by the Code.

Of course, we are not meaning that directors are not in a proper sense officers, or that the Code application under Act of 1887 might not be made by them, but it is clear that it might be so made under Code, while the Act of 1887 seems to contemplate proposition from an officer or agent constituted as president; and, doubtless, if that Act had been in view in making this application, a further organization and election of president, manager, or other authorized agent of like character would have appeared, and such application been submitted by him to the Mayor, instead of by the body of directors, without an official head or managing officer, to another body of men, the Board of Mayor and Aldermen, as was done, and as was manifestly authorized by the Code. But it is useless to discuss these minor questions, to show by argument that it was not made under Act of 1887. The fact that construction could possibly make the provisions of the application answer the requirements of both statutes, only more strongly sustains the construction that application should "set forth" in express terms, that it was made under the latter law, if it was thus intended, so that rights should be settled under the one or

the other after the subscription was made. If both statutes were precisely the same as to form and terms of application, the fact that different powers are vested, different obligations are imposed, and different rights secured by the latter, would make it essential that it be shown in the application under which law it was made (both being in full force), and clearly shows that such requirement by the Legislature, that it be set forth, was not a matter of form, but of most vital import. It was necessary, in fact, to show, and was made imperatively so by the express terms of the last Act, whether the application was made under it (and if not, it was, of course, under the other), so that when the proposition submitted might be accepted, powers would vest which this Act confers, and rights that it gives be secured. Otherwise, it could not be claimed by either party to the contract that the different provisions of the latter law were to govern as to these powers and rights.

The application then being under the Code, the question is, Was the subscription valid, and can it be enforced? That statute does not admit of but one construction. The termini of one route must be given, not alternately of two. Of course an absolute point of termination may not be essential, but the substantial termini of *one line* so definite that it must have been surveyed and substantially located, and the termini designated and line so defined as to approximate its general direction accurately enough for an estimate of the grading,

embankment, and masonry to be made by a competent engineer and sworn to. Code, § 1145 (M. & V., § 1282). This section is imperative, and not merely directory. *Winston* v. *T. & P. R. R. Co.*, 1 Bax., 60.

If the law could be evaded by submitting along with such location and estimate, an alternative proposition for a different route, without either survey, definite location, or estimate, it is obvious that it would be a matter of no consequence whether it was the one or the other, for just as in this case a survey, location, and estimate of one line between two points would be filed with suggestion of another not so located, surveyed, or estimated, and when the subscription was voted the latter might be adopted. The law would, therefore, serve no purpose except as a cloak to conceal the real intent of construction.

We think it plain that such a proposition could not be submitted, or, if submitted in such form, could bind the corporation voting for subscription, only if the surveyed and estimated route was in fact adopted and constructed, in which event the alternative proposition might be treated as surplusage, and if line was in fact built as located, the municipality might be estopped to say that along with a valid proposition had been submitted an alternative invalid one. Just as if it had voted for a proposition to pay cash or issue bonds, and was not vested with power to issue bonds, yet, if the subscription was otherwise valid and work

performed in strict accord with it, it might be re-
quired to pay cash as agreed and estopped to deny
its liability to do this because of the fact that it
could not do the other.

In this case the road was not constructed upon
the line surveyed, estimated, and designated. It
follows, therefore, that the defendant cannot be
compelled to pay its subscription or to issue bonds
therefor. Had the application been under the Act
of 1887 a like result would follow under the
reasoning on the alternative proposition. Neither
statute contemplates such a thing, but both re-
quire substantial designation of a single line with
two—not three—termini.

It is argued, however, that whether the sub-
scription was valid or invalid, the road was built
for Morristown, where it now lies; that it was a
long time under construction, and that the Board
of Mayor and Aldermen, and the people of the
corporation knew that it was being so constructed,
and that large sums of money were being ex-
pended on the faith of the subscription, and the
corporation is now estopped to deny its liability.

To this there are several answers. The road
was not built for Morristown, but for the com-
pany. Morristown was but one of the subscribers
to its stock, and stands in the relation merely of
a stockholder resisting collection of subscription
upon the ground of its invalidity, and whether it
might be estopped from insisting, as it does among
other things, that the company was chartered to

State, *ex rel.*, *v.* Morristown.

construct a road from Morristown, in Hamblen County, to a point in Grainger County, and had violated its charter right and duty by construction of another and different road to another and different point, and subjected itself to forfeiture by the State, and, therefore, could not compel a subscriber to its stock to pay, it is not material to inquire, for its next answer is conclusive, and that is, that, under the law, no contract can be made by the Board of Mayor and Aldermen, except upon election by the voters of the municipality. What three-fourths of these vote for, becomes the contract or gives it its validity. The Mayor and Aldermen can make no other or different contract by act or omission. They could not make it in the first instance, nor can they vary it, if they expressly undertake to do so, still less by acquiescence in an improper execution of it. In the making and the execution and the enforcement of such contracts with counties or municipalities, parties must stand upon strict law which it has been held is to be so construed and pursued. *Milan* v. *Railroad Company*, 11 Lea, 329.

If the law, strictly construed, authorized the contract, it can be enforced, otherwise not, as between the parties, and there is no question here except as between the company and its subscriber. No bonds having been issued, of course, no question of innocent holder is involved.

There are other questions in the case which have been ably argued, and well merit discussion,

State, *ex rel.*, *v.* Morristown.

but, as it is not necessary to a decision that they be settled, we forbear to do so, and rest our judgment upon the most important and vital question in the case, upon the merits of the controversy.

The judgment of the Circuit Judge, refusing peremptory mandamus, is affirmed with cost.